AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Dec 4, 2024

OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with BENJAMINSHARUM@YAHOO.COM that is stored at premises controlled by Yahoo, Inc.

)
)
)
)
)
)

Case No. 3:24-cm-00020

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ___Southern___ District of ___New York___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343, 1344 | Wire Fraud, Bank Fraud |
| 18 U.S.C. 1957 | Money Laundering |

The application is based on these facts:
See Attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent Matt West
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December

City and state: Fayetteville, AR

Hon. Christy D. Comstock
*Judge's signature*

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH BENJAMINSHARUM@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY YAHOO, INC. | Case No. 3:24-cm-00020<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Matthew West, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with the email account benjaminsharum@yahoo.com ("TARGET account") that is stored at premises controlled by Yahoo, Inc., ("Yahoo") an email provider headquartered at 770 Broadway, 9th Floor, New York, NY 10003-9562. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI) for approximately seven and a half years. I am currently assigned to the Fayetteville Resident Agency of the Little Rock Division, and primarily investigate complex financial crimes. My duties include conducting criminal investigations involving wire fraud, mail fraud, bank fraud, money

laundering, and other federal crimes. I have a bachelor's degree in accounting from Cedarville University. Pursuant to my employment with the FBI, I was trained at the FBI Academy in Quantico, Virginia. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including, relevant to this affidavit, Title 18 U.S.C. § 1343 (Wire Fraud). As such, I am authorized by the Attorney General to request a search warrant.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering) have been committed by Benjamin Sharum. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. For the purposes of this Affidavit, all dates and dollar values should be considered approximate.

7. At all times relevant to this investigation, Shirley J. Bird ("Bird"), the elderly woman whose trust is relevant to this wire fraud and money laundering investigation, was a resident of Carroll, County, Arkansas, which is located in the Harrison Division of the Western

District of Arkansas. Unless noted otherwise, it is upon information and belief that all actions relevant to this investigation took place within the Western District of Arkansas. Bird passed away during the early morning of May 27, 2022.

8. Benjamin SHARUM is the target of this wire fraud and money laundering investigation and was an individual who was close to Bird in the final years of her life. SHARUM worked for Bird's daughter D.K. at The Big Dipper ice cream shop within the Gaskin Switch shopping establishment, and later acquired ownership of the ice cream shop from D.K. According to a former employee, SHARUM owned the ice cream shop until October 2020.

9. Jack Butt is an attorney who practices in Fayetteville, Arkansas, and advised Bird's Estate at all times relevant to this investigation.

10. As detailed in this affidavit, this wire fraud and money laundering investigation relates to the circumstances of transactions by Bird prior to her death and by her estate immediately after her death.

11. On October 12, 2018, Bird amended her trust, which included designating the target of this investigation, SHARUM as successor Trustee and executor of her estate as well as a 16% beneficiary of the trust. SHARUM was but one beneficiary of Bird's trust at the time of her death.

## GASKIN SWITCH PROPERTY

12. At the time of SHARUM's designation as a Trustee, SHARUM was also a debtor of the Trust on a promissory note payable to it related to SHARUM's previous owner financing purchase of a property known as Gaskin Switch from Bird for $850,000. The investigation has revealed that SHARUM was both a trustee on Bird's estate and a significant debtor to that estate.

According to Jack Butt, this Gaskin Switch property and the resulting promissory note were a large portion of Bird's total estate.

13. A prospective buyer of Gaskin Switch, T.S. entered into a contract with SHARUM to buy Gaskin Switch on March 15, 2021.

14. That real estate contract was terminated in June of 2021. Records received from King's River Title & Abstract Company reflect the TARGET account as SHARUM's contact email address and that this email was cc'd on a June 28, 2021, email from T.S. regarding the termination of the real estate contract.

15. Despite very little appearing to be paid towards the principal of that promissory note, on December 8, 2021, SHARUM appears to have resurrected the real estate contract between him and T.S. and ultimately sold Gaskin Switch to T.S. for $1,000,000.

16. Bird's estate received a payoff of only $55,955.75.[1]

## FINANCIAL TRANSACTIONS AFTER BIRD'S DEATH

17. Bird passed away on the morning of May 27, 2022.

18. Immediately subsequent to, but on the same morning of her death on May 27, 2022, SHARUM went to the bank and deposited $51,000 in cashier's checks payable to Bird into a joint account at Freedom Bank of Southern Missouri ("joint Freedom Bank account") that belonged to

---

[1] Even in a light most favorable to SHARUM, in a review of text message communication from SHARUM, he has previously claimed that he "gave [Bird] over 200k in 2 months at closing time" and that he "had paid over 400k in payments." Bank records your Affiant have reviewed do not reflect these amounts paid towards the promissory note. One issue under investigation is whether Bird had forgiven SHARUM's Note at any point.

4

both SHARUM and Bird. Prior to these deposits of cashier's checks, this joint Freedom Bank account carried a balance of just over $6,000.

19.     On May 31, 2022, Jack Butt, the attorney for Bird's trust, emailed SHARUM at the TARGET address advising him of the following:

> Ben, according to the most recent documents Shirley signed, you are the executor of her estate, and Trustee of her trust and **have** both the authority and **responsibility to immediately secure all of Shirley's assets from loss** – fire, theft, vandalism, etc. , including making sure that her insurance is in force to protect from such losses. **No one should be taking anything from her estate at present.** There is a great deal of information that we need to exchange in order for you to properly move forward in that regard. The one phone number you've left me has not been answered by you yet after many attempts to call back, and doesn't have voice mail, so we need to keep trying to call each other frequently, in order to hook up in light of your very limited phone accessibility.
>
> Your authority will be confirmed by various documents, but we need to talk to figure out how to do that. In the meantime, you should order at least 20 death certificates from the undertaker. I'm busy and realize it is hard to get through to me as well, but please keep trying to call me, or situate yourself so that you can be reached by phone. Thanks, Jack

[Emphasis Added].

20.     Despite the written admonition to not take anything from the estate, between June 1 and June 17, 2022, SHARUM received $10,000 in cash from this joint Freedom Bank account and also transferred $37,000 into SHARUM's personal Freedom Bank account ending in #3217. SHARUM also withdrew $24,000 in cash from his personal Freedom Bank account # 3217 between June 6 and June 24, 2022. On July 22, 2022, SHARUM transferred an additional $8,000 from the joint Freedom Bank account into his personal Freedom Bank account #3217.

21.     During these transactions, on June 2, 2022, Jack Butt emailed SHARUM trust certificates to the TARGET account, to sign and return. On June 30, 2022, Butt received a death certificate, a signed trust certificate which SHARUM signed on June 17, 2022, and a Tax ID

number for the trust. According to my interview with Jack Butt, these documents were the bare minimum documentation required for SHARUM to take everything from the trust.

22. On July 27, 2022, SHARUM emailed Jack Butt from the TARGET account:

Mr. Butt,
**I am still waiting on Cornerstone bank to allow me access to her accounts and banking info!** I was told as of this am that the bank attorney had some questions and had reached out to you! As soon as I figure out what is at the bank and what is owed I will be almost done with those task! Thanks, Ben Sharum

[Emphasis Added].

23. According to Jack Butt, he never received any further communication from SHARUM, through the TARGET account or otherwise, even though Butt needed additional documentation from SHARUM.

24. From September 28 to October 12, 2022, SHARUM transferred $30,000 from Shirley Bird's trust account at Cornerstone Bank into Freedom Bank account ending in #5053 in the name of The Shirley J Bird Irrevocable Trust ("Freedom Bank Trust account"). From the Freedom Bank Trust account, between October 3 and October 13, 2022, SHARUM transferred a total of $23,500 into his personal Freedom Bank account #3217. SHARUM also withdrew $3,500 in cash from the Freedom Bank Trust account on October 5, 2022. Based upon an analysis of the proceeds of those transfers into his Freedom Bank personal account #3217, on October 12, 2022, SHARUM spent $15,118 at Looper Auction for collectibles and memorabilia such as a 1959 Lincoln, a pinball machine, and beer signs.

25. The investigation into the disposition of the trust assets further revealed that on October 14, 2022, SHARUM deposited four US Savings Bonds in the name of Shirley Bird, totaling $23,517.60, into the joint Freedom Bank account. SHARUM then transferred a total of $21,047.72 into his personal Freedom Bank account #3217 between October 17 and November

10, 2022. SHARUM also took $1,000 out in cash from his personal Freedom Bank account #3217 on October 18, 2022.

26.    On December 15, 2022, the Freedom Bank Trust account received $294,583.82 from the closing on the sale of 206-208 Van Buren Street in Eureka Springs, which was an asset belonging to Bird's trust. On the same day, $235,000 was provided to Cornerstone Bank to pay on a loan in the name of D.K. related to a house in Belize. D.K. is the daughter of Bird, and both SHARUM and D.K. currently live in the country of Belize.

27.    On April 26, 2024, in related civil litigation regarding the disposition of Bird's assets, an Order was entered by the Carroll County Circuit Court that cited SHARUM for contempt of court and sanctioned SHARUM for failing to appear as ordered by the Court and for his failure to appear for properly noticed depositions. On August 10, 2024, SHARUM's counsel sent an email containing a Motion to Withdraw on a related civil suit in the Circuit Court of Carroll County. The email was addressed to plaintiff's attorney as well as the TARGET account and an email address presumably associated with D.K. Within the attached motion, SHARUM's counsel provided "benjanimsharum@yahoo.com" as the only contact information for SHARUM. Given the TARGET account on the "To" line, it is presumed that this was a typographical error and that he intended to type TARGET account.

28.    I present this search warrant for the purposes of reviewing the correspondence contained in this email account for information regarding SHARUM's receipt of his duties regarding the trust instrument, his state of mind at the time he conducted transactions with estate funds, and for communications contemporaneous with the decedent and others prior regarding the disposition of trust assets. This evidence of communications with the decedent and others might not exist anywhere else and may contain statements and communications that could either

7

exonerate or inculpate SHARUM. I also hope to review for evidence of additional financial accounts or transactions with trust funds and his international travel as it may relate to the current location of trust assets.

29. In general, an email that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Yahoo servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo's servers for a certain period of time.

## BACKGROUND CONCERNING EMAIL

30. In my training and experience, I have learned that Yahoo provides a variety of on-line services, including electronic mail ("email") access, to the public. Yahoo allows subscribers to obtain email accounts at the domain name **yahoo.com**, like the email account listed in Attachment A. Subscribers obtain an account by registering with Yahoo. During the registration process, Yahoo asks subscribers to provide basic personal information. Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

31. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment

8

(including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

32. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

33. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute

9

evidence of the crimes under investigation because the information can be used to identify the account's user or users.

34. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to

commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

35. Based on the forgoing, I request that the Court issue the proposed search warrant for evidence in the TARGET account based upon the probable cause established and averred herein regarding violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1956 and 1957 (Money Laundering) that may have been committed by Benjamin Sharum. There is probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes further described in Attachment B..

36. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Yahoo. Because the warrant will be served on Yahoo, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

37.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed pursuant to the standing orders of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, continue their absence from the country in Belize, destroy or tamper with evidence, change patterns of behavior, and otherwise seriously jeopardize the investigation.

Further your affiant sayeth not.

Respectfully submitted,

MATTHEW WEST
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on December 4, 2024

Honorable Christy D. Comstock
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with BenjaminSharum@yahoo.com ("Target account") that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc. a company headquartered at 770 Broadway, 9th Floor, New York, NY 10003-9562.

## ATTACHMENT B

### Particular Things to be Seized

**I.   Information to be disclosed by Yahoo, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.   The contents of all emails associated with the account **November 1, 2018 to August 1, 2024,** including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   The types of service utilized;

d.   All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within **thirty (30) days** of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of Wire Fraud, in violation of 18 U.S.C. § 1343, Bank Fraud, in violation of 18 U.S.C. § 1344, Money Laundering in violation of 18 U.S.C. §§ 1956 and 1957, those violations involving Benjamin Sharum and occurring after November 1, 2018 through August 1, 2024, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) The receipt of instructions regarding Sharum's duties as a trustee;

(b) Communications with the Decedent prior to her death which may reveal additional instructions, requests, and wishes not contained in current reviewed documents;

(c) Communications with third parties, about Sharum's beliefs regarding his responsibilities as a trustee, his rights under the trust instrument, and the Decedent's final wishes;

(d) Evidence of financial accounts and transactions with trust assets;

(e) International travel which may indicate where trust assets are currently located;

(f) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

  (i) The identity of the person(s) who communicated with the Target account about matters regarding his responsibilities as a trustee, his rights under the trust instrument, and the Decedent's final wishes including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Yahoo, Inc. and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Yahoo, Inc. The attached records consist of _____

_____

_____

_____

I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Yahoo, Inc. and they were made by Yahoo, Inc. as a regular practice; and

    b.    such records were generated by Yahoo, Inc.'s electronic process or system that produces an accurate result, to wit:

       1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Yahoo, Inc. in a manner to ensure that they are true duplicates of the original records; and

       2.      the process or system is regularly verified by Yahoo, Inc. and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                          Signature